JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

Callahan, Dylan, derivatively on behalf of Stanley Black & Decker, Inc

### DEFENDANTS

Stanley Black & Decker, Inc, Donald Allan, Jr., James M. Loree, Lee Mcchesney, Andrea J. Ayers, George W. Buckley, Patrick D. Campbell, Carlos M. Cardoso, Robert B. Coutts, Debra A. Crew, Michael D. Hankin, Adrian V. Mitchell, Jane M. Palmieri, Moideh Poul, and Irving Tan

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Eric P. Smith, Esq., Faxon Law Group, LLC., 59 Elm Street, New Haven, CT 06510, (203)624-9500

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☒ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331

Brief description of cause:
Shareholder Derivative Action

### VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE Kari A. Dooley
DOCKET NUMBER 3:23-CV-00369

DATE 8-2-2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DYLAN CALLAHAN, derivatively on behalf of STANLEY BLACK & DECKER, INC., | |
| Plaintiff, | **C.A. No. _____** |
| vs. | |
| DONALD ALLAN, JR., JAMES M. LOREE, LEE MCCHESNEY, ANDREA J. AYERS, GEORGE W. BUCKLEY, PATRICK D. CAMPBELL, CARLOS M. CARDOSO, ROBERT B. COUTTS, DEBRA A. CREW, MICHAEL D. HANKIN, ADRIAN V. MITCHELL, JANE M. PALMIERI, MOIDEH POUL, and IRVING TAN, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| STANLEY BLACK & DECKER, INC., | |
| Nominal Defendant. | AUGUST 2, 2023 |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Dylan Callahan ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Stanley Black & Decker, Inc. ("Stanley" or the "Company"), files this Verified Shareholder Derivative Complaint against Donald Allan, Jr. ("Allan"), James M. Loree ("Loree"), Lee McChesney ("McChesney"), Andrea J. Ayers ("Ayers"), George W. Buckley ("Buckley"), Patrick D. Campbell ("Campbell"), Carlos M. Cardoso ("Cardoso"), Robert B. Coutts ("Coutts"), Debra A. Crew ("Crew"), Michael D. Hankin ("Hankin"), Adrian V. Mitchell ("Mitchell"), Jane M. Palmieri ("Palmieri"), Moideh Poul ("Poul"), and Irving Tan ("Tan") collectively (the "Individual Defendants") and together with

1

Stanley (the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Stanley, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, as well as for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Stanley, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action filed derivatively on behalf of Stanley that seeks to remedy wrongdoing committed by the Company's current and former directors and/or officers from October 28, 2021 through July 28, 2022, at least (the "Relevant Period").

2.     Stanley is a Connecticut corporation and global manufacturer of industrial tools and household hardware. The Company's two most profitable segments are its Industrial segment and Tools & Outdoor segment.

3.     Stanley's Industrial segment is comprised of engineered fastening and infrastructure businesses. The businesses mainly sell fasteners, fittings, and other engineered

products. Additionally, the Industrial segment sells hydraulic tools and heavy equipment for large construction projects, such as highways.

4.      Stanley's Tools & Outdoor segment includes the Power Tools Group, Hand Tools, Accessories & Storage, and Outdoor Power Equipment businesses. Additionally, it includes Stanley's most popular brands such as DeWalt, Black+Decker, Craftsman, Troy-Bilt, and Irwin. According to the Company's annual report filed on Form 10-K for the fiscal year ended December 31, 2022, the Tools & Outdoor segment comprised 85% of Stanley's revenue in 2022.

5.      The COVID-19 pandemic provided a great boon to Stanley's Tools & Outdoor segment because consumers were spending more time at home, resulting in more do-it-yourself ("DIY") projects.

6.      During the Relevant Period, Stanley began a multi-year simplification of its business through acquisitions and divestitures to return to the Company's roots as a tool manufacturer. Stanley experienced the strongest consumer demand in Company's history which allowed the Company to finance its activities.

7.      Throughout 2021 and into 2022, Defendants repeatedly informed investors that the demand caused by the COVID-19 pandemic's stay-at-home orders and new remote working arrangements led more consumers to be in their homes more often, thereby increasing home remodeling and DIY projects, resulting in extraordinary high consumer demand for Stanley's tools and outdoor products.

8.      During the Relevant Period, Defendants made material misrepresentations to investors and the public that the ballooned consumer demand for tools and outdoor products would persist through 2022, even in the face of rising inflation, interest rates, and product prices.

9.     Additionally, during the Relevant Period Defendants admitted that supply chain and component sourcing were integral for Stanley to match production to demand. The Defendants, however, misrepresented to the public and investors that they were closely monitoring the impact of price increases and inflation on consumer demand, and that Stanley would be able to react accordingly in the event consumer demand changed.

10.     In contrast to Defendants' statements touting high consumer demand and the Company's ability to adeptly react to any negative impact from inflation or price increases, Stanley failed to respond to clear indication that the demand bubble created in the wake of COVID-19 was about to pop. In addition, Defendants knew that the statements they made were false and misleading, as Defendants were tracking Stanley's point-of-sale results to monitor any changes in demand.

11.     Making matters worse, on March 9, 2022, several of the Individual Defendants solicited shareholders to vote on various proposals in the proxy statement filed on Schedule 14A with the SEC that day, which contained materially false and misleading statements and omissions (the "2022 Proxy Statement"). The 2022 Proxy Statement called for shareholders to: (1) to elect to the Defendants Ayers, Campbell, Cardoso, Coutts, Crew, Hankin, Loree, Mitchell, Palmieri, Poul, and Tan to the Company's Board of Directors (the "Board"); (2) to approve, on an advisory basis, the compensation of the Company's named executive officers; (3) to approve the selection of Ernst & Young LLP as the Company's registered independent public accounting firm for the 2022 fiscal year; (4) to approve the 2022 Omnibus Award Plan (the "Plan"); (5) to consider a shareholder proposal regarding the ownership threshold required to call for a special shareholder meeting, if properly presented; and (6) to transact such other business as may properly come before the meeting or any adjournment or postponement thereof. The purpose of

the Plan was to "attract and retain exceptionally qualified individuals" who the Company depends on to achieve its goals and to sustain shareholder value. The Plan provided for an additional 9.8 million shares for issuance. As a result of the Individual Defendants' false and misleading statements, shareholders voted to approve the Plan, enabling the Individual Defendants and others at the Company to materially benefit, unjustly, therefrom. The matters omitted from the 2022 Proxy Statement and/or otherwise misrepresented were significant to investors, who were aware of the Company's claims that COVID-19 demand would continue through 2022 and into 2023. Had shareholders been aware of the true state at the Company, they would not have voted to approve the Plan, as it sought to (and did) reward the Individual Defendants based on false pretenses.

12.     On April 28, 2022, Defendants released partially corrective disclosures that revealed Stanley's Tools and Outdoor net sales dropped in the Company's first fiscal quarter ended April 2, 2022 to $4.4 billion, and in response, Stanley revised and decreased its earnings per share guidance for the fiscal year ended on December 31, 2022 ("Fiscal Year 2022"). Additionally, the Defendants disclosed that Stanley's gross margin dropped "610 basis points from prior year as price realization was more than offset primarily by commodity inflation, higher supply chain costs to serve demand and lower volumes."

13.     Because of this news, Stanley's stock dropped 8.6% or $12.01 per share, from a close of $139.14 per share on April 27, 2022 to close at $127.13 on April 28, 2022.

14.     Yet, in the face of this news, Defendants continued to make false and misleading statements about the declining demand.  The Company's April 28, 2022 press release stated the following:

> Net sales for the quarter were $4.4 billion, up 20% versus prior year driven by strategic outdoor power equipment acquisition (+23%) and price realization

(+5%), *partially offset by lower volume (-6%)* and currency (-2%). *Volume was in line with expectations, but constrained by temporary electronic component supply challenges, which have continued to improve.*

(Emphasis added.)

15.    During an earnings call with investors hosted on the morning of April 28, 2022, Stanley's Chief Executive Officer ("CEO") James Loree blamed supply chain issues rather than deteriorating demand and reiterated the press release by stating that "*customer demand remained strong* across many of our global markets and price realization accelerated sequentially from the fourth quarter. *The volume could have been higher, but for the supply-constrained environment that we continue to make progress on resolving.*" (Emphasis added.)

16.    The Individual Defendants also repeatedly misled investors by attributing the Tools and Outdoors sales decline to supply chain issues instead of clearly falling demand. During the April 28, 2022 earnings call, Defendant Loree told investors the following:

> In our end markets today, while the boom global conditions of 2020 and 2021 have leveled off, the fundamentals and secular drivers remain healthy and are still very much intact. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have plenty of runway *to continue to drive enduring demand.*

(Emphasis added.)

17.    Loree further stated that "[a]nd while we see continued momentum within our core markets, we will monitor and respond accordingly if and when we observe any adverse impact from a higher interest rate environment and/or significant elasticity of demand effects following our pricing actions."   Additionally, Defendant Allan told investors "Turning to our segment results. *The headline for the first quarter is that demand for our products remains healthy*, and we are executing the necessary pricing actions to mitigate higher input costs.*"* (Emphasis added.) During questioning from investors, Defendant Allan furthered stating "[W]e

thought it was prudent to just do a modest haircut on the volume side to represent the potential impact of all those price increases. ***But it is not an assumption that there's some significant slowdown related to overall demand***.*"* (Emphasis added.)

18.     The truth was revealed on July 28, 2022, as Stanley released a press release revealing results for the second fiscal quarter ended July 2, 2022 before stock markets opened for trading. Defendant Allan stated in the press release:

> While the macroeconomic environment – including inflation rising interest rates ***and significantly slower demand in late May and June – drove the majority of the challenges*** we faced this quarter, these headwinds underscore the need to accelerate our strategic transformation. ***As the softening of the demand environment accelerated rapidly during the last portion of the quarter***, we began taking immediate corrective cost actions, which we are continuing to implement. ***We are now preparing for demand to normalize closer to 2019 levels for the remainder of 2022***.

(Emphasis added.)

19.     The morning of July 28, 2022, the Company hosted an earnings call for investors and analysts. Defendant Allan announced that a drastic slowdown in consumer demand for power tools in May through June 2022 plummeted sales volume by double digits. Defendant Allan also announced that the Company's net income for its second quarter had nosedived from $459.5 million in 2021 second quarter to $87.6 million in the 2022 second quarter, causing Stanley to cut its 2022 earnings per share guidance by almost half.

20.     The revelation of plummeting demand, shrinking sales, and slashing earnings guidance resulted in Stanley's common stock, which had closed at $117.45 per share on July 27, 2022, to fall to a closing price of $98.58 per share on July 28, 2022, on heavy trading volume. This represented more than a 16% day-over-day drop.

21.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series

of materially false and misleading statements regarding the Company's business, operations, and prospects, including in the 2022 Proxy Statement. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the present economic condition, including increasing interest rates, inflations, and consumers returning to work in the office, was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

22.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

23.     Furthermore, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Approximately 15.9 million of the Company's common stock were repurchased at inflated prices between February 2022 and July 2022, inclusive, for over $2.4 billion. As the Company's common stock was actually only worth $98.58 per share, the price at which it was trading on July 28, 2022, the Company overpaid

approximately $857.3 million in total. Additionally, several of the Individual Defendants materially benefited (and/or continue to benefit) from shareholder approval of the Plan, which provided an additional 9.8 million shares for awards made thereunder and established lucrative compensation ceilings of $750,000 for several of the Individual Defendants.

24.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

25.     In light of the Individual Defendants' misconduct—which has subjected the Company, Defendant Allan, Defendant Loree, and Defendant McChesney to a securities class action lawsuit pending in the United States District Court for the District of Connecticut (the "Securities Class Action"); the need to undertake intake internal investigations; the need to implement adequate internal controls; losses from the waste of corporate assets; and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

26.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud and misconduct, the substantial likelihood of the directors' liability in this derivative action and of Defendants Allan, Loree, and McChesney's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested and/or independent directors, a majority of Stanley's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n, Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

28.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

29.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

31.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

32.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in and with a headquarters in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

33.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

34.     Plaintiff is a current shareholder of Stanley. Plaintiff has continuously held Stanley common stock since he first purchased it on January 14, 2019. Plaintiff is a citizen of Massachusetts.

### Nominal Defendant Stanley Black & Decker

35.     Stanley is a Connecticut corporation with a headquarters at 1000 Stanley Drive, New Britain, CT. Stanley's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SWK".

### Defendant Allan

36.     Defendant Allan has worked at Stanley since 1999 and served as Stanley's President and CEO and as a member of the Board since July 2022. Defendant Allan previously served as Stanley's President and Chief Financial Officer ("CFO") from February 2021 to July 2022.  According to Stanley's proxy statement filed with the SEC on March 10, 2023, (the "2023 Proxy Statement"), Defendant Allan beneficially owned 307,525 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Allan owned approximately $26 million worth of Stanley stock as of that date.

37.     For Fiscal Year 2022, Defendant Allan received $8,093,256 in total compensation from the Company. This included $1,060,000 in salary, $5,078,138 in stock awards, $1,671,738 in option awards, and $283,380 in all other compensation.

38.     For the fiscal year ended December 31, 2021 (the "Fiscal Year 2021"), Defendant Allan received $5,222,007 in total compensation from the Company. This included $863,833 in

salary, $2,351,585 in stock awards, $711,750 in option awards, $969,612 in incentive plan compensation, and $325,227 in all other compensation.

39.     The 2023 Proxy Statement stated the following about Defendant Allan:

**Expertise**

As Chief Executive Officer of the Company, Mr. Allan provides the Board with knowledge of the daily workings of the Company and also with the essential experience and expertise that can be provided only be a person who is intimately involved in running the Company. Mr. Allan's service on the Board and as Chief Executive Officer of the Company provides seamless continuity of leadership for the Board and management.

**Business Experience**

Mr. Allan has served as President and Chief Executive Officer of the Company since July 2022.
Mr. Allan joined the Company in 1999 as Assistant Controller. He was named Corporate Controller in 2000, Vice President and Corporate Controller in 2002, Vice President and Chief Financial Officer in 2009, Senior Vice President and Chief Financial Officer in 2010, Executive Vice President and Chief Financial Officer in 2016, and President and Chief Financial Officer in April 2021. Before he joined the Company, Mr. Allan held financial management positions of increasing responsibility with Loctite Corporation and spent nine years at Ernst & Young.

40.     Upon information and belief, Defendant Allan is a citizen of Connecticut.

**Defendant Loree**

41.     Defendant Loree served as the Company's CEO, President, and as a member of the Board from August 2016, to July 2022. According to the 2023 Proxy Statement, Defendant Loree beneficially owned 719,832 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Loree owned approximately $60,890,588.90 worth of Stanley stock.

42.    For Fiscal Year 2022, Defendant Loree received $13,625,418 in total compensation. This included $652,000 in salary, $5,100,094 in stock awards, and $7,873,324 in all other compensation.

43.    For Fiscal Year 2021, Defendant Loree received $13,159,209 in total compensation. This included $1,304,000 in salary, $7,023,444 in stock awards, $2,028,926 in option awards, $2,276,784 in incentive plan compensation, and $526,055 in all other compensation.

44.    The 2022 Proxy Statement stated the following about Defendant Loree:

Mr. Loree joined the Company in July 1999 as Vice President, Finance and Chief Financial Officer. He was named Executive Vice President and Chief Financial Officer in September 2002, Executive Vice President and Chief Operating Officer in January 2009, President and Chief Operating Officer in January 2013, and President and Chief Executive Officer of the Company in July 2016. Before he joined the Company, Mr. Loree held positions of increasing responsibility in financial and operating management in industrial businesses, corporate and financial services at General Electric from 1980 to 1999. Mr. Loree served on the board of Harsco Corporation from 2010 to 2016 and as Chair of Harsco's Audit Committee for three years during that period. Mr. Loree currently serves on the board of Whirlpool Corporation.

Mr. Loree is 63 years old and is a member of the Executive Committee

As the Chief Executive Officer of the Company, Mr. Loree provides the Board with knowledge of the daily workings of the Company and also with the essential experience and expertise that can be provided only by a person who is intimately involved in running the Company. Mr. Loree's service on the Board and as Chief Executive Officer of the Company provides seamless continuity of leadership for the Board and management.

45.    Upon information and belief, Defendant Loree is a citizen of Connecticut.

**Defendant McChesney**

46.    Defendant McChesney served as the Company's Senior Vice President and Chief Financial Officer, Global Tools & Storage from February 2021 to October 2022. Previously, Defendant McChesney served as the CFO, Global Tools & Storage and Corporate Financial

Planning & Analysis and as President, Hand Tools, Accessories & Storage. Defendant McChesney departed Stanley in October 2022.

47.     Upon information and belief, Defendant McChesney is a citizen of Maryland.

**Defendant Ayers**

48.     Defendant Ayers has served as a Company director since December 2014 and was elected as Chair of the Board effective April 22, 2022. She is also a member of the Compensation and Talent Development Committee ("Compensation Committee") and Finance and Pension Committee. She previously served as chair of the Compensation Committee. According to the 2023 Proxy Statement, Defendant Ayers beneficially owned 24,444 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Ayers owned approximately $2 million worth of Stanley stock as of that date.

49.     For Fiscal Year 2022, Defendant Ayers earned $449,911 in total compensation. This included $127,575 in earned fees, $310,020 in stock awards, and $12,316 in all other compensation.

50.     For Fiscal Year 2021, Defendant Ayers earned $311,451 in total compensation. This included $145,000 in fees earned or paid in cash, $160,000 in stock awards, and $6,451 in all other compensation.

51.     The 2023 Proxy Statement stated the following about Defendant Ayers:

**Expertise**

Ms. Ayers' experience transforming Convergys Corporation from a company with three business lines to a customer management solutions company with approximately 125,000 employees worldwide provides critical insight as the Board navigates important strategic decisions related to the Company's transformation and its global operations. Her expertise in customer management

analytics, technology, and human capital management provides an important and unique perspective to the board.

**Business Experience**

Ms. Ayers served as President and Chief Executive officer of Convergys Corporation from November 2012 through October 2018, and a director of Convergys from October 2012 through October 2018. From 2008 to 2012, Ms. Ayers served as President of Convergys Customer Management Group Inc., and from 2010 to 2012, Ms. Ayers also served as Chief Operating Officer of Convergys Customer Management Group Inc.

52.     Upon information and belief, Defendant Ayers is a citizen of Ohio.

**Defendant Buckley**

53.     Defendant Buckley served as a Company director from March 2010 until his retirement in April 2022. Defendant Buckley was elected Chairman of the Board effective January 1, 2017, and served as Chairman during the majority of the Relevant Period. Prior to the Company's merger in 2010, Defendant Buckley served on the board of Black+Decker from 2006 to 2010.

54.     For Fiscal Year 2022, Defendant Buckley received $94,941 in total compensation. This included $31,250 in fees earned or paid in cash, $50,000 in stock awards, and $13,691 in all other compensation.

55.     According to the 2022 Proxy Statement, Defendant Buckley received $487,861 in total compensation for Fiscal Year 2021. This included $125,000 in fees earned or paid in cash, $360,000 in stock awards, and $2,861 in all other compensation.

56.     The 2022 Proxy Statement stated the following about Defendant Buckley:

GEORGE W. BUCKLEY, retired Chairman, President and Chief Executive Officer of 3M Company, was elected Chairman of the Board effective January 1, 2017, and has been a director of the Company since March 2010. Mr. Buckley also served on the Board of The Black & Decker Corporation from 2006 to 2010. From April 2015 through December 2016, he served as Lead Independent Director of the Board.

Mr. Buckley served as Chairman, President and Chief Executive Officer of 3M Company from December 2005 until May 2012. From 1993 to 1997, Mr. Buckley served as the Chief Technology Officer for the Motors, Drives, and Appliance Component Division of Emerson Electric Company. Later, he served as President of its U.S. Electric Motors Division. In 1997, he joined the Brunswick Corporation as a Vice President, became Senior Vice President in 1999, and became Executive Vice President in 2000. Mr. Buckley was elected President and Chief Executive Officer in June 2000. As we noted above, he was elected Chairman, President, and Chief Executive Officer of 3M Company in December 2005. Mr. Buckley serves as Chairman of Smiths Group plc, and a director of Hitachi Ltd. Within the last five years, Mr. Buckley has served on the board of PepsiCo, Inc.

Mr. Buckley is 75 years old and is our Chairman of the Board until the Annual Meeting, when he will be retiring from the Board in accordance with our Corporate Governance Guidelines. He has served as Chair of the Executive Committee and as a member of the Audit Committee and the Compensation and Talent Development Committee.

57.     Upon information and belief, Defendant Buckley is a citizen of the United Kingdom.

### **Defendant Campbell**

58.     Defendant Campbell has served as a Company director since October 2008. Defendant Campbell also serves as Chair of the Audit Committee and as a member of the Compensation Committee and Executive Committee.

59.     According to the 2023 Proxy Statement, Defendant Campbell beneficially owned 22,651 shares of the Company's common stock as of February 27, 2023. Given that the price per share of the Company's common stock at the close of trading on February 27, 2023 was $84.59, Defendant Campbell owned approximately $1.9 million worth of Stanley stock as of that date.

60.     For Fiscal Year 2022, Defendant Campbell received $320,381 in total compensation. This included $150,000 in earned fees or paid in cash, $160,020 in stock awards, and $10,361 in all other compensation.

61.     For Fiscal Year 2021, Defendant Campbell received $310,484 in total compensation. This included $148,750 in fees earned or paid in cash, $160,000 in stock awards, and $1,734 in all other compensation.

62.     The 2023 Proxy Statement stated the following about Defendant Campbell:

**Expertise**

Mr. Campbell brings extensive finance and global leadership experience to the Board, having served as Chief Financial Officer of 3M Company. This experience enhances Board oversight of the Company's long-term plan, particularly as it relates to decisions related to finance, capital allocation, global operations, and corporate strategy.

**Business Experience**

Mr. Campbell served as Senior Vice President and Chief Financial Officer of 3M Company from 2002 to 2011. Prior to his tenure with 3M, Mr. Campbell had been Vice President of International and Europe for General Motors Corporation where he served in various finance-related positions during his 25-year career with that company.

63.     Upon information and belief, Defendant Campbell is a citizen of Minnesota.

**<u>Defendant Cardoso</u>**

64.     Defendant Cardoso served as a Company director from October 2007 until April 2023. During his time on the Board, Defendant Cardoso was a member of the Corporate Governance Committee and the Finance and Pension Committee. According to the 2023 Proxy Statement, Defendant Cardoso beneficially owned 15,883 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Campbell owned approximately $1.3 million worth of Stanley stock as of that date.

65.    For Fiscal Year 2022, Defendant Cardoso received $335,810 in total compensation. This included $135,802 in fees earned or paid in cash, $160,020 in stock awards, and $39,988 in all other compensation.

66.    For Fiscal Year 2021, Defendant Cardoso received $349,260 in total compensation. This included $140,000 in fees earned or paid in cash, $160,000 in stock awards, and $49,260 in all other compensation.

67.    The 2022 Proxy Statement stated the following about Defendant Cardoso:

CARLOS M. CARDOSO, Principal, CMPC Advisors LLC, has been a director of the Company since October 2007.

Mr. Cardoso joined CMPC Advisors LLC in January 2015. Prior to that, he served as Chairman of Kennametal, Inc. from January 2008 until December 2014 and as President and Chief Executive Officer of Kennametal from January 2006 until December 2014. Mr. Cardoso joined Kennametal in 2003 and served as vice President, Metalworking Solutions and Services Group and then as Executive Vice President and Chief Operating Officer before he became President and Chief Executive Officer. Prior to his tenure with Kennametal, Mr. Cardoso was President of the Pump Division of Flowserve Corporation from 2001 to 2003. Mr. Cardoso is a director of Hubbell Incorporated. Within the past five years, Mr. Cardoso has served on the board of Garrett Motion Inc.

Mr. Cardoso is 64 years old and is Chair of the Corporate Governance Committee and a member of the Finance and Pension Committee and the Executive Committee.

As Chairman of the Board, President and Chief Executive Officer of Kennametal, Inc., Mr. Cardoso faced the challenge of managing a complex company on a daily basis. This experience, combined with the skills Mr. Cardoso acquired in his leadership roles at Kennametal, Inc. and Flowserve Corporation, make him a valuable resource for the Board and management.

68.    Upon information and belief, Defendant Cardoso is a citizen of Nevada.

**Defendant Coutts**

69.    Defendant Coutts served as a Company director from July 2007 to April 2023. Coutts was a member of the Compensation Committee and the Corporate Governance

Committee. According to the 2023 Proxy Statement, Defendant Coutts beneficially owned 20,404 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Coutts owned approximately $1.7 million worth of Stanley stock as of that date.

70.     For Fiscal Year 2022, Defendant Coutts received $323,080 in total compensation. This included $125,000 in fees earned or paid in cash, $160,020 in stock awards, and $38,060 in all other compensation.

71.     For Fiscal Year 2021, Defendant Coutts received $294,521 in total compensation. This included $125,000 in fees earned or paid in cash, $160,000 in stock awards, and $9,521 in all other compensation.

72.     The 2022 Proxy Statement stated the following about Defendant Coutts:

ROBERT B. COUTTS, retired Executive Vice President, Electronic Systems of Lockheed Martin Corporation, has been a director of the Company since July 2007.

Mr. Coutts served as an Executive Vice President of Lockheed Martin Corporation from 1999 to 2008, first as Executive Vice President, Systems Integration from 1999 to 2003, and then as Executive Vice President, Electronic Systems from 2003 to 2008. While at Lockheed Martin, Mr. Coutts also served as Chairman of Sandia National Laboratories. Prior to his tenure with Lockheed Martin, Mr. Coutts held senior management positions over a 20-year period with the General Electric Company. In addition, he is a director of Hovnanian Enterprises, Inc.

Mr. Coutts' long experience in senior management of Lockheed Martin and General Electric Company has led him to develop expertise in manufacturing, program management, supply chain management, technology and government contracting that is of value to the Board as the Company continues to improve its global manufacturing operations and sourcing. He also has cyber technology experience through many of the contracts he managed for and with the United States Government, which makes him a valuable resource for the Board and management.

73.     Upon information and belief, Defendant Coutts is a citizen of Connecticut.

**Defendant Crew**

74.     Defendant Crew has served as a director since December 2013. She also has served as Chair of the Compensation Committee since February 2022. According to the 2023 Proxy Statement, Defendant Crew beneficially owned 10,436 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Crew owned approximately $882,781.24 worth of Stanley stock as of that date.

75.     For Fiscal Year 2022, Defendant Crew received $333,781 in total compensation. This included $142,356 in fees earned or paid in cash, $160,000 in stock awards, and $31,405 in all other compensation.

76.     For Fiscal Year 2021, Defendant Crew received $305,073 in total compensation. This included $125,000 in fees earned or paid in cash, $160,000 in stock awards, and $20,073 in all other compensation.

77.     The 2023 Proxy Statement stated the following about Defendant Crew:

**Expertise**

Ms. Crew brings a breadth of marketing, operations and strategy experience to the Board, underscored by her executive roles at Diageo, R.J. Reynolds, and PepsiCo. Ms. Crew's global perspective, combined with proven commercial excellence at leading consumer products companies, provides the Board with Critical Insights

**Business Experience**

Since July 2022, Ms. Crew has served as Chief Operating Officer of Diago plc, a global leader in beverage alcohol. From July 2020 to July 2022, she served as President, North America and Global Supply, Diageo plc. From January 2017 to December 2017, she served as President and Chief Executive Officer of Reynolds American Inc. Prior to that, she served as President and Chief Commercial Officer of R.J. Reynolds Tobacco Co. from October 2014 to October 2015 and as President and Chief Operating Officer of the company effective October 2015 to December 2016. Before joining R.J. Reynolds Tobacco, Ms. Crew served as President and General Manager, PepsiCo North America Nutrition from August

2014 to September 2014, as President, PepsiCo American Beverages from August 2012 through August 2014 and as President, Western European Region of PepsiCo Europe from April 2010 through April 2012. Prior to her tenure with PepsiCo, Ms. Crew held positions of increasing responsibility at Kraft Foods, Nestle S.A. and Mars, Inc. From 1997 to 2010. From 1993 to 1997, Ms. Crew served as a captain in the United States Army in military intelligence.

78.     Upon information and belief, Defendant Crew is a citizen of the United Kingdom.

**Defendant Hankin**

79.     Defendant Hankin has served as a Company director since April 2016. Defendant Hankin currently serves as the Chair of the Finance and Pension Committee and as a member of the Audit Committee and Executive Committee. According to the 2023 Proxy Statement, Defendant Hankin beneficially owned 9,174 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the close of trading on February 27, 2023 was $84.59, Defendant Hankin owned approximately $776,028.66 worth of Stanley stock as of that date.

80.     For Fiscal Year 2022, Defendant Hankin received $317,473 in total compensation. This included $140,000 in fees earned or paid in cash, $160,000 in stock awards, and $17,453 in all other compensation.

81.     For Fiscal Year 2021, Defendant Hankin received $344,494 in total compensation. This included $140,000 in fees earned or paid in cash, $160,000 in stock awards, and $44,494 in all other compensation.

82.     The 2023 Proxy Statement stated the following about Defendant Hankin:

**Expertise**

Mr. Hankin's experience building and running a complex global financial company, evidence by successfully growing Brown Advisory Incorporated from approximately $1.5 billion assets under management to over $130 billion during his tenure, gives the Board a unique perspective on finance, capital allocation, global operations, and corporate strategy. His familiarity with financial and investment planning and analysis, his understanding of capital structure and

valuation issues, and his experience with cybersecurity make him a valuable resource for the Board and management.

**Business Experience**

Since 1998, Mr. Hankin has served as Chief Executive Officer of Brown Advisory Incorporated, an independent investment firm that provides investment solutions to individuals, families, nonprofits and institutions globally. From 1993 to 1998, Mr. Hankin served as Executive Vice President and Chief Operating Officer of Alex Brown Investment Advisory & Trust Company, a subsidiary of Alex Brown Incorporated, where he helped create the business that became Brown Advisory. Prior to that, Mr. Hankin was a partner at Piper & Marbury (now DLA Piper) where he specialized in business and tax law.

83.    Upon information and belief, Defendant Hankin is a citizen of Maryland.

**Defendant Mitchell**

84.    Defendant Mitchell has served as a Company director since February 2022. Defendant Mitchell serves on the Audit Committee and Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Mitchell beneficially owned 1,168 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the close of trading on February 27, 2023 was $84.59, Defendant Mitchell owned approximately $98,801.12 worth of Stanley stock as of that date.

85.    For Fiscal Year 2022, Defendant Mitchell received $271,220 in total compensation. This included $108,476 in fees earned or paid in cash, $160,000 in stock awards, and $2,724 in all other compensation.

86.    The 2023 Proxy Statement stated the following about Defendant Mitchell:

**Expertise**

Mr. Mitchell's extensive background in corporate strategy and finance, coupled with his operations experience and expertise in technology, digital, data, and advanced analytics make him a critical resource for the Board and management team. Having served in multiple leadership positions at consumer product companies, including Macy's, Arhaus, and Crate and Barrel, Mr. Mitchell provides a unique industry-specific perspective to the board.

**Business Experience**

Mr. Mitchell joined Macy's, Inc. in November 2020 as Executive Vice President and Chief Financial Officer. Prior to joining Macy's, Mr. Mitchell was Managing Director and Partner in the Digital BCG and Consumer Practices of Boston Consulting Group (BCG). From 2016 to 2017, he served as Chief Executive Officer of Arhaus LLC, a home furnishings retailer. Prior to his tenure at Arhaus, Mr. Mitchell held positions of increasing responsibility at Crate and Barrel. He joined Crate and Barrel in 2010 as a Chief Financial Officer. In 2011, he took on the additional responsibilities of Chief Operating Officer and, from 2014 to 2015, he also concurrently served as interim CEO. He previously held management positions at Target Corporation from 2007 to 2010 including director of strategy and interactive design for target.com and director of innovation and productivity, leading enterprise-wide projects for Target Corporation. Mr. Mitchell began his career and spent approximately 10 years at McKinsey & Company, Inc. where he co-founded the North American Lean Operations Retail Practice.

87.     Upon information and belief, Defendant Mitchell is a citizen of New York.

**<u>Defendant Palmieri</u>**

88.     Defendant Palmieri has served as a Company director since February 2021. Defendant Palmieri serves on the Corporate Governance Committee and the Finance and Pension Committee. According to the 2023 Proxy Statement, Defendant Palmieri beneficially owned 1,870 shares of Stanley common stock as of February 27, 2023. Given that the price per share at the close of trading on February 27, 2023 was $84.59, Defendant Palmieri owned approximately $158,183.30 worth of Stanley stock as of that date.

89.     For Fiscal Year 2022, Defendant Palmieri received $297,684 in total compensation. This included $125,000 in fees earned or paid in cash, $160,020 in stock awards, and $12,664 in all other compensation.

90.     For Fiscal Year 2021, Defendant Palmieri received $273,519 in total compensation. This included $108,134 in fees earned or paid in cash, $160,000 in stock awards, and $5,385 in all other compensation.

91.     The 2023 Proxy Statement stated the following about Defendant Palmieri:

**Expertise**

Ms. Palmieri's demonstrated record leading global industrial operating segments, in addition to her experience in sales, digital marketing innovation, M&A, and operations, helps the Board oversee the broad array of challenges the Company faces. Ms. Palmieri's engineering background and expertise in product design, with a focus on sustainability and energy efficiency, makes her an important resource for the Board and management team.

**Business Experience**

As President, Industrial Intermediates & Infrastructure of Dow Inc., Ms. Palmieri oversees an industry-leading portfolio of businesses, including Polyurethanes, Chlor-Alkali & Vinyl, Construction Chemicals and Industrial Solutions. In addition, she has executive oversight for Dow business in Asia Pacific. Ms. Palmieri has more than 20 years of experience with Dow. Prior to her current responsibilities, Ms. Palmieri held the role of business president, Dow Building & Construction. She also held a variety of business roles throughout her career, spanning marketing, sales, new business development and business operations in several Dow businesses, including Dow Automotive, Dow Specialty Chemicals, Dow Coating Solutions, and Dow Solar.

92.     Upon information and belief, Defendant Palmieri is a citizen of Michigan.

**Defendant Poul**

93.     Defendant Poul has served as a Company director since February 2021. Defendant Poul serves on the Audit Committee and the Corporate Governance Committee. According to the 2023 Proxy Statement, Defendant Poul beneficially owns 1,870 in Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Poul beneficially owned approximately $158,183.30 worth of Stanley stock as of that date.

94.     For Fiscal Year 2022, Defendant Poul received $294,599 in total compensation. This included $125,000 in fees earned or paid in cash, $160,020 in stock awards, and $9,579 in all other compensation.

95.     For Fiscal Year 2021, Defendant Poul received $278,228 in total compensation. This included $108,134 in fees earned or paid in cash, $160,000 in stock awards, and $10,094 in all other compensation.

96.     The 2023 Proxy Statement stated the following about Defendant Poul:

**Expertise**

Ms. Poul brings a wide range of experience to the Board, including product engineering and development, sales and marketing, corporate strategy, and government relations. Throughout her career, Ms. Poul has built and led high-performing teams across different functions, businesses, and geographies, including in highly regulated industries and businesses requiring strong market development expertise.

**Business Experience**

Ms. Poul's 3M career began in 2011 when she joined the Health Care Business Group as the Global Marketing Leader for the Critical and Chronic Care Solutions Division. In the years following, she held global leadership roles in the Food Safety and Infection Prevention businesses before being named President and General Manager of 3M Canada in 2016, then executive vice president of 3M's Safety & Graphics Business Group in 2018 and then executive vice president of 3M's Health Care Business Group in 2019. Prior to 3M, Ms. Poul held several leadership roles of increasing responsibility with Medtronic and Boston Scientific.

97.     Upon information and belief, Defendant Poul is a citizen of Minnesota.

**<u>Defendant Tan</u>**

98.     Defendant Tan has served as a Company director since February 2020. Defendant Tan serves as Chair of the Corporate Governance Committee and as a member of the Executive Committee and Audit Committee. According to the 2023 Proxy Statement, Defendant Tan beneficially owned 2,531 in Stanley common stock as of February 27, 2023. Given that the price per share at the closing of trade on February 27, 2023 was $84.59, Defendant Tan owned approximately $214,097.29 worth of Stanley stock as of that date.

99.    For Fiscal Year 2022, Defendant Tan received $299,206 in total compensation. This included $129,198 in fees earned or paid in cash, $160,020 in stock awards, and $9,998 in all other compensation.

100.    For Fiscal Year 2021, Defendant Tan received $285,000 in total compensation. This included $125,000 in fees earned or paid in cash and $160,000 in stock awards.

101.    The 2023 Proxy Statement stated the following about Defendant Tan:

**Expertise**

Mr. Tan's expertise in digitization and innovation, and in developing and implementing a global operating strategy, is critical to the Board as it oversees the Company's innovation efforts. Mr. Tan's global perspective and deep knowledge of Asian markets, in addition to his expertise in operating strategy are critical to the Board as it oversees the Company's long-term strategy.

**Business Experience**

Mr. Tan has served as Executive Vice President, Global Operations of Western Digital Corporation since March 2022. Mr. Tan previously served as Chairman, Asia-Pacific Japan & China at Cisco from 2020 to February 2022. Prior to that, he was Executive Vice President and Chief of Operations where he was responsible for the development and implementation of Cisco's operating strategy, targeting growth through productivity improvements and innovation across all core business functions. He also led Cisco's transformation to an end-to-end digital company. Prior to that role, Mr. Tan held positions of increasing responsibility, including serving as the leader of Cisco Asia-Pacific and Japan (APJ), leader of Cisco ASEAN, leader of Cisco Singapore and Brunei, and senior manager in both Enterprise Sales Operations and Managed Services. Before joining Cisco, Mr. Tan was a principal at A.T. Kearney, a management consultancy firm specializing in mergers and acquisitions and merger integration in IT and communications. He also worked at Hewlett-Packard as business-unit leader for the APJ Communications and Media Solutions Group.

102.    Upon information and belief, Defendant Tan is a citizen of Singapore.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

103.    By reason of their positions as officers, directors, and/or fiduciaries of Stanley and because of their ability to control the business and corporate affairs of Stanley, the Individual

Defendants owed Stanley and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stanley in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Stanley and its shareholders so as to benefit all shareholders equally.

104.    Each director and officer of the Company owes to Stanley and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

105.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Stanley, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

106.    To discharge their duties, the officers and directors of Stanley were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

107.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Stanley, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the

Company has been ratified by the remaining Individual Defendants who collectively comprised Stanley's Board at all relevant times.

108.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

109.    To discharge their duties, the officers and directors of Stanley were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Stanley were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Connecticut and the United States, and pursuant to Stanley's own Code of Business Ethics and Corporate Governance;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Stanley conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Stanley and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Stanley's operations would comply with all applicable laws and Stanley's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

110.    Each of the Individual Defendants further owed to Stanley and the shareholders the duty of loyalty requiring that each favor Stanley's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

111. At all times relevant hereto, the Individual Defendants were the agents of each other and of Stanley and were at all times acting within the course and scope of such agency.

112. Because of their advisory, executive, managerial, directorial, and controlling positions with Stanley, each of the Individual Defendants had access to adverse, non-public information about the Company.

113. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Stanley.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

114. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

115. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

116.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Stanley was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

117.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

118.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Stanley and was at all times acting within the course and scope of such agency.

**STANLEY'S CODE OF BUSINESS ETHICS AND CORPORATE GOVERNANCE**

***Stanley's Code of Business Ethics***

119.    Stanley's Code of Business Ethics ("Code of Ethics") provides Company employees with a guide to "reinforce the values and principles of the organization, and… policies provide more specific guidance on the proper way to comply with our standards and to complete many of our tasks. We must know, understand, and following this Code and our

policies with no exceptions. The Code of Business Ethics further states "This Code applies to all of us - employees, officers, directors, contractors, vendors, and suppliers."

120.    In a section titled, "We compete fairly," the Code of Ethics states the following, in relevant part:

- We price our goods competitively and fairly and promote them accurately and honestly.
- We provide only honest and truthful information to our business partners and suppliers, never knowingly providing inaccurate information to gain an advantage.
- We limit our conversations with competitors and do not disclose to them our pricing and costs.
- We avoid formal and informal agreements with our competitors that may hinder fair competition.
- We gather competitive information using only legal and ethical methods.
- We provide our suppliers with honest and truthful information.

121.    In a section titled, "We prohibit insider trading," the Code of Ethics states the following:

As employees of Stanley Black & Decker, we may become aware of material, non-public, inside information regarding our company, customers, business partners or competitors. Information can be deemed material if a reasonable investor may find it valuable in a decision to buy or sell a security. Information can be deemed non-public if it is not widely available to the investing public.

We must remember that trading in securities or tipping others to make investment decisions based on inside information not only violates our ethical standards, but it is also illegal.

122.    In a section titled, "We remain free from bias or conflict of interest," the Code of Ethics states the following, in relevant part:

A conflict of interest occurs when our personal interest competes, interferes or even appears to interfere with the best interest of the company.

When working on behalf of Stanley Black & Decker, we must always act ethically and in the best interest of our colleagues and the company. We cannot allow personal interests to cloud our judgment.

What are some examples of a possible conflict of interest?

- Conducting business with vendors that are close personal friends
- Hiring or supervising a family member or a close personal friend
- Having a significant personal investment in a company that you work with in your capacity at Stanley Black & Decker
- Having outside work that competes with Stanley Black & Decker
- Having a significant investment in a company that competes with Stanley Black & Decker
- Having an investment where you or a family member would benefit if the company stock price were to fall (short selling)

***Stanley Black & Decker, Inc. Corporate Governance Guidelines as Adopted by the Board of Directors***

123. "Stanley Black & Decker, Inc. Corporate Governance Guidelines as Adopted by the Board of Directors" ("Corporate Governance Guidelines") state in a section titled "Director Responsibilities" the following, in relevant part:

> The basic responsibility of the Directors is to exercise their business judgment in good faith and in what they reasonably believe to be in the best interest of the Corporation. In discharging that obligation, Directors are entitled to rely on their fellow Directors and the Corporation's senior executives and outside advisors, auditors, and legal counsel, except to the extent that a Director reasonably believes such person's integrity, honesty or competence is in doubt.
>
> ***
>
> Directors are expected to attend Board meetings and meetings of committees on which they serve, and to spend time needed and meet as frequently as necessary to properly discharge their responsibilities. Information and data that are important to the Board's understanding of the business to be conducted at a Board or committee meeting should generally be distributed in writing to the directors before the meeting, and Directors should review these materials in advance of the meeting.

124. Stanley's Corporate Governance Guideline stated in a section titled "Code of Business Ethics" that "[t]he Board expects Directors to act ethically at all times and to adhere to the Corporation's Code of Business Ethics and other applicable policies."

***Stanley Black & Decker, Inc. Supplemental Code of Ethics for CEO and Senior Financial Officers***

125. Stanley's "Supplemental Code of Ethics for CEO and Senior Financial Officers"

("Supplemental Code of Ethics") states the following:

1. The CEO and all senior financial officers are responsible for full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the CEO and each senior financial officer promptly to bring to the attention of the Disclosure Committee any material information of which he or she may become aware that affects the disclosures made by the Company in its public filings.

2. The CEO and each senior financial officer shall promptly bring to the attention of the Disclosure Committee and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

3. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the CEO and to the Audit Committee any information he or she may have concerning any violation of the Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have significant role in the Company's financial reporting, disclosures or internal controls.

4. The CEO and each senior financial officer shall promptly bring to the attention of the General Counsel or the CEO and to the Audit Committee any information he or she may have concerning evidence of material violation of the securities or other laws, rules or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof.

5. The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code or of these additional procedures by the CEO and the Company's senior financial officers. Such actions shall be reasonably designed to deter wrongdoing and to promote accountability for adherence to the Code and to these additional procedures, and shall include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, Page 2 | 2 Updated May 8, 2018 demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board) and termination of the individual's employment.

In determining what action is appropriate in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been

advised prior to the violation as to the proper course of action and whether or not the individual in question had committed other violations in the past.

95.    In violation of the Code of Ethics, Supplemental Code of Ethics, and the Corporate Governance Guidelines, the Individual Defendants, as key officers and as members of the Company's Board, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  Also, in violation of the Code of Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## STANLEY'S AUDIT COMMITTEE CHARTER

96.    The Company also maintains an Audit Committee Charter (the "Charter"). Regarding the Company's annual Forms 10-K the Charter states that the Audit Committee shall

> [r]eview and discuss with management and the independent auditor the annual audited financial statements prior to the filing of the Form 10-K, including specific disclosures made in management's discussion and analysis and the results of the annual audit and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

97.    Regarding the Company's Form 10-Qs, the Charter states that the Audit Committee shall "[r]eview and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form 10-Q, including specific disclosures made in management's discussion and analysis and the results of the independent auditor's review of the quarterly financial statements."

98.     Moreover, with respect to the Company's earnings press releases, the Charter provides that the Audit Committee shall "[d]iscuss with management the Company's earnings press releases, including the use of "pro-forma", "adjusted" or other non-GAAP financial information and key performance indicators, as well as financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general and consist of discussing the types of information to be disclosed and the types of presentations to be made."

99.     On the topic of "Risks," the Charter states that the Audit Committee shall "[d]iscuss with management and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including cybersecurity risk, and the Company's risk assessment and risk management policies."

100.    With respect to the Company's Internal Control Procedures," the Charter provides that the Committee shall "Review disclosures made to the Audit Committee by the Company's CEO and CFO during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud (regardless of materiality) involving management or other employees who have a significant role in the company's internal controls."

101.    In a section titled "Compliance and Risk Oversight Responsibilities," the Charter states, in relevant part:

> 17. Review and approve, or delegate to the Chair to review and approve, in advance, the appointment and replacement of the senior internal auditing executive.
>
> 18. Discuss, or delegate to the Chair to discuss, with the senior internal auditing executive, management and the independent auditor the internal audit department responsibilities, the annual internal audit plan and scope, budget, quality controls and staffing of the internal audit function, and any recommended changes in the planned scope of internal audits.

102.   In a section titled "Compliance and Risk Oversight Responsibilities," the Charter states in relevant part that the Committee shall:

19. Obtain periodic reports from the Company's General Counsel with respect to compliance by the Company and its affiliates with applicable legal requirements and the Company's Code of Business Ethics. Review with management and advise the Board, not less frequently than annually, with respect to the implementation and effectiveness of the Company's compliance and ethics programs, including the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Company's Code of Business Ethics. The General Counsel and the senior auditing executive will periodically communicate with the Chair about any such matters as appropriate.

20. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Receive periodic reports regarding any investigations and concerns raised through such procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Relevant Background

103.   Stanley Black & Decker is a Connecticut corporation created in 2010 as a result of a merger between Stanley Works and Black & Decker. Stanley is the world's largest tool company and a global manufacturer of hand and power tools, outdoor products, and an engineer of fastening systems for industrial customers.

104.   Stanley recently shifted its corporate strategy to simplify its offerings and focus the Company's investments into sections: Tools & Outdoor and Industrial.

105.   Stanley's Tools & Outdoor segment sells a variety of equipment to a wide range of customers, including retail consumers, professionals, distributions, and industrial customers across the globe. The Tools & Outdoor segment is further divided into Power Tools Group, Hand Tools/Accessories & Storage, and Outdoor Power Equipment.

106.   Stanley's Tools & Outdoor segment compromises a majority of Stanley's total revenue, making up 82% of total revenue in 2021 and 85% of total revenues in 2022. Most sales

are distributed through retailers. Stanley's Tools & Outdoor Segment is bolstered by its wide range of brands including DeWalt, Black+Decker, Mac Tools, Craftsman, Cub Cadet, Hustler, Troy-Bilt, and Irwin. The United States comprised about 63% of Stanley's revenue in 2022. Resultingly, Stanley measures demand in the US by tracking the volume of sales and point-of-sale data.

107.    To continue solidifying its focus on Tools & Outdoor, Stanley acquired MTD Holdings and Excel Industries, both of which are tool and equipment companies, in November and December of 2021.

108.    To further the simplification of its core offerings, Stanley sold its Convergent Security Solutions business, its Mechanical Access Solutions business, and Stanley Oil & Gas. As Tools & Outdoor continues to be Stanley's core offering, Stanley has continued to divest its once diverse offerings.

**<u>False and Misleading Statements</u>**

***October 28, 2021, Press Release***

109.    On October 28, 2021, the Company released a press release (the "October 2021 Press Release") prior to the beginning of trade on the NYSE that reported excellent financial and operating results in the Company's third fiscal quarter of 2021. In the release, Defendant Loree misled investors with the following statement:

> "We are pleased to deliver 10% organic growth and record third quarter revenues ***as customer demand remains robust across the majority of our end markets***…. Our multi-ear growth story remains ***compelling given the positive secular demand trends and unique opportunities ahead***, which have been further enhanced by our recently announced MTD and Excel acquisitions. We continue to invest in innovation, manufacturing automation, inventory and our supply chain to fuel our growth, and I am confident that our company is positioned for success and top-quartile performance as a world leading innovator with an elevated commitment to ESG."

Defendant Loree continued: "*We are prioritizing meeting demand* in universally difficult supply chain environment and are actively addressing the inflationary trends impacting the business with new targeted pricing actions and increased productivity measures…."

(Emphasis added)

110.    The October 2021 Press Release further misled investors by indicating a strong future demand with the following statements:

All regions delivered organic growth with North America +9%, Europe +20% and emerging markets 28%. *Demand was robust across all markets as the secular shifts related to the reconnection with the home and garden and eCommerce were amplified by our industry-leading innovation and strong professional demand. North America reflected retail growth as well as consistently strong commercial and industrial channels. Point-of-sale demand remained at robust levels in U.S. retail and channel inventory ended below historical levels.*

(Emphasis added.)

***October 28, 2021, Q3 2021 Conference Call***

111.    On the morning of October 28, 2021, the Company held an earnings conference call to discuss the Company's financial and operating results for the third fiscal quarter ended October 2, 2021 (the "Q3 2021 Conference Call"). During the call, Defendant Loree misled investors by overemphasizing demand while pinning blame on supply-chain issues. Defendant Loree stated "*[c]ustomer demand remained at robust levels* across commercial and retail end markets and strong trends continued in homebuilding and remodeling, commercial construction, professional activity, and global economic growth. Innovation was also a positive, *which is driving demand around electrification and other demands.*" (Emphasis added.)

112.    Later in the Q3 2021 Conference Call, Defendant Loree further misled investors with false assurance that current demand trends would continue into the future stating "[a]nd further, *we remain highly confident in our multiyear growth and margin expansion plans.* There are several *positive secular demand trends that are benefiting our businesses*, and we

remain bullish on the resi and nonresi construction markets as well as the industrial recovery."

(Emphasis added.)

113.    During the Q3 2021 Conference Call, Defendant Allan (who was Stanley's CFO
at the time of the call) misled investors with the statement:

> ***Our thesis on demand is playing out as underlying construction activity remains
> strong and the Pro is driving growth***, overcoming a robust growth performance
> in the comparable period last year and a little bit of moderation in the DIY
> category***. Further demonstrating the durability of these trends***, our latest POS
> results showed mid-single-digit growth over the last 4 weeks, covering late
> September through mid-October, with the last measured week up double digits, ***a
> very good signal of the healthy backdrop in U.S. retail.***

(Emphasis added.)

114.    Additionally, in the Q3 2021 Conference Call, Defendant McChesney furthered
Defendant Loree's misleading statements about the continued growth of Stanley's Tools &
Outdoor business that "we are focused on serving our customers and have invested in inventory
to serve the ***robust demand environment here in 2021 and '22 and beyond, which is a major
item that explains the year-over-year performance****."* (Emphasis added.)

115.    In the Q3 2021 Conference Call, Defendant Allan falsely misrepresented to
investors Stanley's positioning to react to any sudden changes to the robust demand:

> The ***market demand environment remains very strong and supportive***. We have
> phenomenal set of growth catalysts across the businesses, and ***we are actively
> addressing the supply and inflation environment***, which has not worsened from
> what we have experienced in Q3. ***We remain well positioned to deliver above-
> market organic growth*** with operating leverage, resulting in strong free cash flow
> generation that will drive top quartile shareholder returns over the long term.

(Emphasis added.)

116.    Defendant Loree during the Q3 2021 Conference Call further falsely reassured
investors about the sustainability of the heightened demand:

> *[W]e continue to execute on the strong demand trends and deliver exceptional organic growth despite the temporarily challenging supply chain environment.* We are enjoying positive secular trends, vibrant markets and a strong array of growth catalysts, and we expect this to continue. I am more than pleased with our team's efforts, and I'm excited about the enormous potential as we close out this year and look forward to continuing top and bottom-line growth to drive shareholder value creation in the coming months and years.

(Emphasis added.)

117.    In response to a question by an analyst during the Q3 2021 Conference Call, Defendant Loree emphasized that the high demand market was sustainable, stating:

> *The demand is strong. The conditions are supportive. So serving the demand, I think, is the challenge.* And I think we – *we're confident we've created the demand and the environment is supportive*, and we need to serve the demand. That is challenging. But you can see we delivered on our third quarter organic growth commitment, 10% despite the challenges that we faced. And so we have a resilient organization and we have all the growth programs in place, and *we have a high level of confidence that we can deliver that sort of growth.*

(Emphasis added.)

### *February 1, 2022, Q4 2021 and 2021 Fiscal Year Earnings Conference Call*

118.    On February 1, 2022, the Company held an earnings conference call to discuss the financial and operational results for the fourth fiscal quarter and full fiscal year ended December 31, 2021 (the "Q4 2021 Conference Call").

119.    During the Q4 2021 Conference Call, Defendant Loree provided false assurance to investors that the highs of 2021 demand would persist into 2022, stating that "*[w]e benefited from extraordinarily strong customer demand*, which continues for our innovative products and portfolio of brands, both of which underpin and support our position as the world's #1 tool company." (Emphasis added.)

120.    During the Q4 2021 Conference Call, Defendant Loree further bolstered the misleading belief that 2021's high demand trends would continue into 2022, stating:

> ***There are several positive secular demand trends that are benefiting our businesses. We remain bullish on construction, DIY*** as well as gradual recoveries in the automotive and aerospace OEM markets. We've developed an array of growth catalysts, including product innovation, e-commerce and electrification to position our businesses to capture this opportunity. And we are continuing to focus on innovation, manufacturing, automation, capacity expansion and our logistics capabilities to meet the elevated demand in the near term and support strong, sustainable growth over the medium and long term. In this regard, ***we believe we are well positioned in 2022*** with a target of 7% to 8% organic growth….

(Emphasis added.)

121.    Later in the Q4 2021 Conference Call, Defendant Loree falsely told investors that Stanley was well-positioned to react to any changes in the high-demand environment, stating "[a]nd so while there is much to be excited about within our core markets, ***we will carefully watch for any impacts*** from a higher interest rate environment ***or changes in the elasticity of demand following price increases and react accordingly if things change***." (Emphasis added.)

122.    During the Q4 2021 Conference Call, Defendant Loree assured investors of management's ability to react, stating that "we're confident in our ability to execute in today's dynamic, volatile environment."

123.    During the questioning segment of the Q4 2021 Conference Call, Defendant Loree was asked how exactly Stanley was prepared to handle any changes in demand. Defendant Loree continued to mislead investors of Stanley's reactivity by stating that ***"[w]e just need to continue to monitor price elasticity, competitive dynamics,*** all those different things that one does ***when one manages in an environment like this***." (Emphasis added.)

124.    Tagging along with Defendant Loree's misstatements about the Company's position to react to any changes in demand, Defendant Allan stated "***we'll watch this very closely,*** and it's why we're taking this approach on the volume side where ***we're not being***

***overly aggressive in forecasting where the volume might go.*** But we're prepared, as Jim and I both mentioned, to really pursue higher volume." (Emphasis added.)

125.    The statements in paragraphs ¶¶ 109-124 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the present economic condition, including increasing interest rates, inflations, and consumers returning to work in the office was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *2022 Proxy Statement*

126.    On March 9, 2022, Stanley filed the 2022 Proxy Statement. Defendants Ayers, Campbell, Cardoso, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan solicited the 2022 Proxy Statement which, *inter alia*, called for shareholders to approve the Plan. The 2022 Proxy Statement also solicited shareholder approval for an additional 9.8 million shares for issuance under the Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed of the true financial state of the Company and the wrongdoing alleged herein.

Under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $750,000. However, as mentioned above for the 2022 Fiscal Year, Defendants Ayers, Campbell, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan received $449,911, $320,381, $333,781, $317,473, $271,220, $297,684, $294,599, and $299,206, respectively, in total compensation. The Plan also resulted in an agreement with Defendant Allan to guarantee a minimum award of $6.75 million for fiscal year 2022 and a minimum award of $9.25 million for fiscal year 2023.

127.    With respect to Risk Oversight the 2022 Proxy Statement stated the following:

As required by our Corporate Governance Guidelines, during the orientation process for new directors, each director receives a presentation from the Company's senior management that describes the Company's risk management policies and procedures. Our Audit Committee routinely discusses with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including cybersecurity risk (and receives regular updates regarding cybersecurity risk), the Company's risk assessment and compliance policies. The Audit Committee regularly reviews compliance and disclosure control procedures, including related to cybersecurity policies, procedures and disclosures. Our Finance and Pension Committee reviews our enterprise risk management process. Our Compensation Committee oversees the operation of the Company's compensation programs to ensure that the compensation programs do not encourage unnecessary or excessive risk-taking. In addition, the full Board reviews the Company's risk management program and its efforts to mitigate risk to the Company from extraordinary liabilities or losses on at least an annual basis. The Board is committed to having individuals experienced in risk management on the Audit Committee and the Finance and Pension Committee, as well as on the full Board.

*ESG Risk Oversight*: Our responsibility and business strategies are interdependent. Both support our progress on ESG and are an area of significant Board focus. For example, the Corporate Governance Committee oversees the Company's policies, objectives and practices regarding the Company's ESG strategy, reporting and public communications, and the full Board reviews the incorporation of ESG goals and metrics into our long-term corporate strategy. The full Board also regularly reviews our human capital management strategy, focusing on areas such as culture, diversity, equity and inclusion, and talent acquisition, retention and development. The Board's oversight of ESG risks is discussed in more detail in the section "Environmental, Social and Governance (ESG) Commitments."

128.    The purpose of the Plan was to "further the Company's goal of attracting, incentivizing and retaining top talent and continuing to offer our key personnel compensation opportunities that are market competitive." The Board requested the Plan because the "Company expect[ed] that it may only have [had] sufficient share capacity under the 2018 Plan through mid-2023…."

129.    Pursuant to the Plan, awards may be granted until the tenth anniversary of the Plan's effective date, which is July 5, 2032. The Plan states that "the maximum amount of compensation that may be paid to any single non-employee director in respect of any single fiscal year… may not exceed $750,000.

130.    In addition to the proposals related to the Plan, the 2022 Proxy Statement also called for shareholder approval: (1) to elect Defendants Ayers, Campbell, Cardoso, Coutts, Crew, Hankin, Loree, Mitchell, Palmieri, Poul, and Tan to the Board; (2) to approve, on an advisory basis, the compensation of the Company's named executive officers; (3) to approve the selection of Ernst & Young LLP as the Company's registered independent public accounting firm for the 2022 fiscal year; (4) to consider a shareholder proposal regarding the ownership threshold required to call for a special shareholder meeting, if properly presented; and (5) to transact such other business as may properly come before the meeting or any adjournment or postponement thereof.

131.    The 2022 Proxy Statement was false and misleading because, despite assertions to the contrary, the Company's Code of Ethics and the Audit Committee Charter were not followed, as evidenced by the numerous false and misleading statements alleged herein and the Individual Defendants' failures to report violations of the Code of Ethics.

132.    The 2022 Proxy Statement also failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the present economic condition, including increasing interest rates, inflations, and consumers returning to work in the office was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

133.    As a result of Defendants Ayers, Buckley Campbell, Cardoso, Coutts, Crew, Hankin, Loree, Mitchell, Palmieri, Poul, and Tan causing the 2022 Proxy Statement to be false and misleading, Company shareholders approved the proposals set forth therein, including, *inter alia*: (1) election of Board members who were violating their fiduciary duties, thereby enabling the Individual Defendants to perpetuate their misconduct and (2) authorization of the Plan, and the 9,800,000 shares of the Company's common stock for use thereunder.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

*April 28, 2022, Q1 Press Release*

134.    On April 28, 2022, the Company released a press release (the "Q1 2022 Press Release") revealing the financial results of first fiscal quarter ended April 2, 2022. The press release again represented that high demand was there to stay, while any shortcomings were the

result of supply chain issues. The press release touted sales growth and downplayed lowered sales volumes, stating:

> ***Net sales for the quarter were*** $4.4 billion, up 20% versus prior year drive by strategic outdoor power equipment acquisitions (+23%) and price realization (+5%), ***partially offset by lower volume (-6%) and currency (-2%). Volume was in line with expectations, but constrained by temporary electronic component supply challenges, which have continued to improve.***

(Emphasis added.)

135.    Later in the Q1 2022 Press Release, Defendant Loree falsely misrepresented Stanley's ability to manage shrinking demand and sales stating that "[w]hile inflationary pressures remain a macro headwind, ***we have demonstrated our ability to offset those pressures.*** We continue to invest in leading edge product innovation, strategic growth initiatives and capacity expansions to better serve our customers to enable multi-year runway for growth, margin expansion and long-term shareholder value creation." (Emphasis added.)

136.    Disregarding the drop in volume, the Q1 2022 Press Release continued to boast about healthy consumer demand that "[u]sing 2019 as a baseline, ***U.S. retail point-of-sale demand remained robust driven by strong professional construction markets*** and innovation with POS growth rates stronger than the growth rates experienced in 2H'21. ***Channel inventory in U.S. retail remained below historical levels***, in particular for professional power tools." (Emphasis added.)

### *April 28, 2022, Q1 Earnings Conference Call*

137.    On April 28, 2022, the same morning as the Q1 2022 Press Release, Stanley held a pre-market earnings conference call (the "Q1 2022 Earnings Call") to discuss the financial results of first fiscal quarter ended April 2, 2022. During that call, Defendants Allan and Loree made a series of false and misleading statements to shareholders attempting to hide from

investors that Stanley's demand was falling and mislead shareholders about Stanley's ability to successfully navigate any changes in demand.

138.     Defendant Allan falsely misled investors about Stanley's 2022 demand, stating that "*[t]he headline for the first quarter is that demand for our products remains healthy*, and we are executing the necessary pricing actions to mitigate higher input costs." (Emphasis added.)

139.     Defendant Allan further falsely assured investors about Stanley's Tool & Outdoor segment demand trends, stating:

> U.S. retail point-of-sale remains at healthy levels, supported by strong professional construction markets and innovation. While the POS comps were down versus a stimulus-aided Q1 2021, the normalized 2019 comparative growth rates accelerated from the levels we experienced in the back half of 2021. This strengthens our conviction that *we continue to experience a very solid demand environment.*

(Emphasis added.)

140.     During the portion of the call when analysts ask questions, Defendant Allan continued to make false and misleading statements regarding 2022 demand. Defendant Allan specifically noted that "[i]t is not an assumption that there's *some significant slowdown related to overall demand*." (Emphasis added.)

141.     Alongside Defendant Allan, Defendant Loree also made numerous false and misleading statements during the Q1 2022 Earnings Call. Defendant Loree stated minimized demand concerns while focusing shareholder blame on supply-chain issues, stating:

> Organic revenue was down 1%, and *customer demand remained strong across many of our global markets* and price realization accelerated sequentially from the fourth quarter. The volume [of sales] could have been highe*r, but for the supply-constrained environment that we continue to make progress on resolving… we expect to be able to alleviate all major electronics-related constraints by the end of the quarter*.

(Emphasis added.)

142.   Later during the Q1 2022 Earnings Call, Defendant Loree told investors that Stanley was well positioned to adapt to the end of the pandemic boom stating:

> In our end markets today, while the boom global conditions of 2020 and 2021 have leveled off, *the fundamentals and secular drivers remain healthy and are still very much intact*. As we look out over the balance of the year, the combination of repair/remodel, new residential construction and commercial construction have *plenty of runway to continue to drive enduring demand* in many of our markets around the world.

(Emphasis added.)

143.   Additionally, Defendant Loree falsely reassured investors both of Stanley's stability in core markets and misled them about Stanley's ability to respond accordingly to any changes, stating that "while *we see continued momentum within our core markets, we will monitor and respond accordingly if and when we observe any adverse impact* from a higher interest rate environment *and/or significant elasticity of demand effects following our pricing actions*." (Emphasis added.)

144.   On the Q1 2022 Earnings Call, Defendant Allan informed investors to decreased expectations in earnings per share stating "[w]e are planning for total revenue growth in the mid-20s, inclusive organic growth of 7%. *We are updating our adjusted earnings per share to a range of $9.50 up to $10.50.*" (Emphasis added.)

145.   This announcement represented a cut of 16 to 20% from the adjusted earnings per share range of $12 up to $12.50 Stanley had first announced for fiscal year 2022.

146.   The market responded negatively to this news as Stanley's stock fell from a close of $139.14 per share on April 27, 2022, to close at $127.13 per share on April 28, 2022. In just one day the stock had dropped $12.01 or 8.6%.

147.   The statements referenced in paragraphs ¶¶ 134-146 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business,

operations, and prospects that were known to Defendants and/or recklessly disregarded by Defendants. Specifically, the identified statements failed to disclose that: (1) the present economic condition, including increasing interest rates, inflations, and consumers returning to work in the office was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *July 28, 2022, Q2 2022 Press Release and Earnings Conference Call*

148.    Prior to markets opening on July 28, 2022, Defendants issued a press release that reported Stanley's financial and operational results for the second fiscal quarter ended July 2, 2022 (the "Q2 2022 Press Release"). The press release revealed Stanley's failure to respond to "significantly slower demand," stating in relevant part:

> While the macroeconomic environment – including inflation, rising interest rates and significantly slower demand in late May and June – drove the majority of the challenges we faced this quarter, these headwinds underscore the need to accelerate our strategic transformation. As the softening of the demand environment accelerated rapidly during the last portion of the quarter, we began taking immediate corrective cost action, which we are continuing to implement. We are now preparing for demand to normalize closer to 2019 levels for the remainder of 2022.

149.    Concurrently with the press release, Stanley held an earnings conference call on July 28, 2022 (the "Q2 2022 Earnings Call"). During the call, Defendant Allan, who had become CEO weeks prior on July 1, 2022, stated in relevant part:

> As you saw from this morning's results, we continue to navigate a dynamic macro environment, including inflation, rising interest rates; and now late in the quarter, we started to see these facts impact retail customer demand across our global tools and outdoor markets. The significantly lower demand trends in June, combined with a very late start to the outdoor season due to weather, resulted in significant volume pressure versus expectations, and revenue landed well below our plan. In response to the sudden shift in demand, we began taking immediate corrective cost action, which are already in progress. We are now preparing for demand to normalize closer to 2019 levels for the remainder of 2022.

150.    The barren reality of the deteriorated demand of Stanley's Outdoor and Tools segment was laid bare. Defendant Allan admitted that "we saw a swift deterioration in consumer tools and outdoor demand." Consequently, Defendant Allan stated that the slow demand had caused Stanley to revise earnings per share "down to $5 up to $6 and to update our free cash flow estimates to be $1 billion to 1.5 billion in the second half of '22."

151.    As a result of this news, the market reacted negatively and Stanley's stock price dropped from a close of $117.45 per share on July 27, 2022, to a close of $98.58 per share on July 28, 2022. This drop represented a decline of $18.87 or more than a 16% reduction.

152.    Analysts and the media reacted swiftly to the news. The DowJones Company MarketWatch reported that the fall was "the stock's… biggest percentage decline since it fell 13.8% on March 8, 2020." Mizuho Financial Group stated that Stanley's guidance cuts "truncates anything that occurred in the quarter," and that the results were "significantly worse than we could have imagined."

## Repurchases During the Relevant Period

153.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.4 billion to repurchase approximately 15,935,335 shares of its own common stock at artificially inflated prices between February 2022 and July 2022.

154.    According to the Form 10-Q for the fiscal quarter ended April 2, 2022, the Company filed with the SEC on April 28, 2022 (the "Q1 2022 Form 10-Q"), the Company purchased 12,681,866 shares of its common stock for approximately $1.96 billion at an average price of $154.82 per share between February 6 and March 5, 2022.

155.    As the Company's stock was actually worth only $98.58 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $713,228,143.84 repurchases of its own stock between February 6 to March 5, 2022.

156.    According to Form 10-Q for the fiscal quarter ended July 2, 2022, the Company filed with the SEC on July 28, 2022 (the "Q2 2022 Form 10-Q"), the Company purchased 3,218,643 shares of its common stock for approximately $460,846,304.74 at an average price of $143.18 per share.

157.    As the Company's stock was actually worth only $98.58 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $143,552,447.80 for repurchases of its own stock between April 3, 2022, and May 7, 2022.

158.    According to the Company's quarterly report filed on Form 10-Q for the third fiscal quarter ended October 1, 2022, filed with the SEC on October 27, 2022, (the "Q3 2022

Form 10-Q") the Company repurchased 34,826 shares of its common stock for approximately $3,967,029.66 at an average price of $113.91 per share.

159.    As the Company's stock was actually worth only $98.59 per share, the price at closing on July 28, 2022, the Company overpaid by approximately $533,534.32 for repurchases of its own stock between July 3, 2022, to August 6, 2022.[1]

160.    Thus, in total, during the Relevant Period, the Company spent $2.4 billion repurchasing 15,935,335 shares at artificially inflated prices representing an overpayment of $857.3 million.

## **DAMAGES TO STANLEY**

161.    As a direct and proximate result of the Individual Defendants' conduct, Stanley has lost and will continue to lose and expend many millions of dollars.

162.    Such losses include nearly $857.3 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

163.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

164.    As a direct and proximate result of the Individual Defendants' conduct, Stanley has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

---

[1]  Upon information and belief, these shares were repurchased during the Relevant Period.

## DERIVATIVE ALLEGATIONS

165.    Plaintiff brings this action derivatively and for the benefit of Stanley to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Stanley, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act and Sections 10(b) and 20(a) of the Exchange Act, as well the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

166.    Stanley is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

167.    Plaintiff is, and has been at all relevant times, a shareholder of Stanley. Plaintiff will adequately and fairly represent the interests of Stanley in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

168.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

169.    A pre-suit demand on the Board of Stanley is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Allan, Ayers, Campbell, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan (the "Director Defendants"), along with non-party Robert J. Manning (together with the Director Defendants, the "Directors"). Plaintiff needs only to allege futility as to five of the ten Directors that were on the Board at the time of filing this complaint.

170.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make and/or cause the Company to make false and misleading statements and omissions of material fact, and, at the same time, to cause the Company to overpay by nearly $857.3 million for repurchases of its own stock, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

171.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

172.     Additional reasons that demand on Defendant Allan is futile follow. Defendant Allan is the Company's CEO and a member of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Allan with his principal occupation for which he receives handsome compensation. During the Relevant Period, Defendant Allan was the CFO and aided then CEO Defendant Loree in making false and misleading statements. Additionally, as CFO during the majority of the Relevant Period he signed in the Q1 2022 Form 10-Q; Q2 2022 Form 10-Q, and Q3 2022 Form 10-Q. As CEO, Defendant Allan is ultimately responsible for the Company's engagement in all of the false and misleading statements and

omissions that were made during the Relevant Period. As the Company's highest officer, Defendant Allan conducted little, if any, oversight of the schemes to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Allan is a defendant in the Securities Class Action. For these reasons, Defendant Allan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173.    Additional reasons that demand on Defendant Ayers is futile follow. Defendant Ayers has served as a Company director since 2014 and has served as the Chair of the Board since July 2022. During the Relevant Period, Defendant Ayers served as the Chair of the Compensation Committee. Defendant Ayers has received and continues to receive compensation for her role as a director as described above. As the trusty Chair of the Board, she conducted little, if any, oversight to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Ayers signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Ayers breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

174.    Additional reasons that demand on Defendant Campbell is futile follow. Defendant Campbell has served as a Company director since 2008. He serves as the Chair of the Audit Committee and serves as a member of the Compensation Committee and Executive Committee. Additionally, Defendant Campbell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he

conducted little, if any, oversight of the schemes to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Campbell signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Campbell breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175.    Additional reasons that demand on Defendant Crew is futile follow. Defendant Crew has served as a Company director since 2013. Defendant Crew also serves as Chair of the Compensation Committee and as a member of the Finance and Pension Committee and Executive Committee. Additionally, Defendant Crew has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Crew signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Crew breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

176.    Additional reasons that demand on Defendant Hankin is futile follow. Defendant Hankin has served as a Company director since 2016. Defendant Hankin also serves as Chair of the Finance and Pension Committee and as a member of the Audit Committee and Executive Committee. Additionally, Defendant Hankin has received and continues to receive compensation

for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Hankin signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Hankin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

177.   Additional reasons that demand on Defendant Mitchell is futile follow. Defendant Mitchell has served as a Company director since February 2022. Defendant Mitchell serves on the Audit Committee and the Corporate Governance Committee. Additionally, Defendant Mitchell has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Mitchell signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Mitchell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.   Additional reasons that demand on Defendant Palmieri is futile follow. Defendant Palmieri has served as a Company director since February 2021. She also serves as member of the Corporate Governance Committee and the Finance and Pension Committee. Defendant

Palmieri has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Meeker signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Palmieri breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Poul is futile follow. Defendant Poul has served as a Company director since February 2021. She also serves as a member of the Audit Committee and Corporate Governance Committee. Additionally, Defendant Poul has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Poul signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Poul breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Tan is futile follow. Defendant Tan has served as a Company director since February 2020. He also serves as the chair of the Corporate Governance Committee and as a member of the Audit Committee and Executive

Committee. Additionally, Defendant Tan has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Tan signed the 2022 Proxy Statement which contained false and misleading statements. For these reasons, Defendant Tan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on the Board is futile follow.

182.    As noted, each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by $857.3 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

183.    Moreover, Defendant Campbell served as Chair of the Audit Committee during the Relevant Period, Defendants Poul and Tan served as members of the Audit Committee for the entirety of the Relevant Period, and Defendant Mitchell served as a member of the Audit Committee for the majority of the Relevant Period.   In violation of the Audit and Risk Committee Charter, Defendants Campbell, Mitchell, Poul, and Tan failed to adequately review

and discuss the Company's Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, Defendants Campbell, Mitchell, Poul, and Tan further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

184.    Moreover, Defendants Ayers, Campbell, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan solicited the 2022 Proxy Statement which, *inter alia*, called for shareholders to approve the Plan. The 2022 Proxy Statement also solicited shareholder approval for the Plan, including the 9.8 million shares to be issued in connection. The misrepresentations and omissions set forth herein were material to shareholders in voting on approval of the Plan who would not have approved the Plan had they been informed about the wrongdoing alleged herein. The Plan established a lucrative pay floor for Defendant Allan, guaranteeing a minimum award of $6.75 million for fiscal year 2022 and $9.25 million for fiscal year 2023. Likewise, under the Plan, the total annual compensation paid to any non-employee director, inclusive of cash compensation and amounts awarded under the Plan, shall not exceed $750,000. However, as mentioned above for the 2022 Fiscal Year, Defendants Ayers, Campbell, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan received $449,911, $320,381, $333,781, $317,473, $271,220, $297,684, $294,599, and $299,206, respectively, in total compensation. Because Defendants Allan, Ayers, Campbell, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan solicited approval for the Plan which, *inter alia*, could have nearly doubled their total annual compensation and did result in substantial increases to Defendant Allan's compensation, demand is futile as to them and, thus, excused. Moreover, as set forth below, Defendants Allan, Hankin, Mitchell, Palmieri, Poul, and Tan were beholden to

those among them who served on the Compensation Committee, that is, Defendants Ayers, Campbell, and Crew.

185.    Defendants Ayers, Campbell, and Crew (the "Compensation Committee Directors") served as members of the Compensation Committee during the Relevant Period. The Compensation Committee Directors solicited shareholder approval of the Plan, which granted them the right to determine how many shares of Company common stock to administer under the Plan to non-employee directors, including themselves. They all stood to benefit from, and did benefit from, shareholder approval of the Plan, which Company shareholders were deceived into approving while the Individual Defendants made false and misleading statements. Thus, non-employee Director Defendants Hankin, Mitchell, Palmieri, Poul, and Tan were beholden to the Compensation Committee Directors, and the Compensation Committee Directors were beholden to each other, because they would not take action against the very directors who held the authority to award them nearly double their total annual compensation pursuant to the Plan. These conflicts of interest precluded the Compensation Committee Directors and the rest of the Director-Defendants from calling into question the Director Defendants and other Individual Defendants' conduct. Thus, demand upon the Compensation Committee Directors would be futile.

186.    In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and the aiding and abetting thereof. In violation of the Code of Ethics, the

Director Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

187.    Stanley has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Stanley any part of the damages Stanley suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

188.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

189.    The acts complained of herein constitute violations of fiduciary duties owed by Stanley's officers and directors, and these acts are incapable of ratification.

190.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Stanley. If there is a directors' and officers'

liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Stanley, there would be no directors' and officers' insurance protection.  Accordingly, the Director Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director Defendants is futile and, therefore, excused.

191.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Stanley to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

192.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

193.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public

interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

195.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

196.    Under the direction and watch of Defendants Ayers, Campbell, Cardoso, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan, the 2022 Proxy Statements failed to disclose that: (1) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements about it; (2) certain Individual Defendants were violating the Code of Conduct without obtaining waivers or else without such waivers being disclosed; and (3) certain Individual Defendants, including those soliciting the 2022 Proxy Statement, were breaching their fiduciary duties to the Company and its shareholders and were thus improperly interested in receiving unjust compensation.

197.    The 2022 Proxy Statement was also materially misleading because it failed to disclose that:  (1) the present economic condition, including increasing interest rates, inflations, and consumers returning to work in the office was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and

increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result, the Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

198.     Defendants Ayers, Campbell, Cardoso, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including but not limited to, the re-election of directors and approval of material incentive award programs.

199.     The false and misleading elements of the 2022 Proxy Statement led Company shareholders to, *inter alia*: (1) elect Defendants Ayers, Campbell, Cardoso, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan to the Board, allowing them to continue or being breaching their fiduciary duties to the Company and (2) to approve the Plan.

200.     The Company was damaged as a result of Defendants Ayers, Campbell, Cardoso, Crew, Hankin, Mitchell, Palmieri, Poul, and Tan's material misrepresentations and omissions in the 2022 Proxy Statement.

201.     Plaintiff on behalf of Stanley has no adequate remedy at law.

## SECOND CLAIM

**Against Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

202.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

203.    The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Stanley. Not only is Stanley now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful schemes perpetrated upon Stanley by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase hundreds of millions of its own shares at artificially inflated prices, damaging Stanley.

204.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

205.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Stanley not misleading.

206.    The Individual Defendants, as top executives and directors of the Company are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were

able to and did control the conduct complained of herein and the content of the public statements disseminated by Stanley.

207.   The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

208.   In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as senior executives or directors of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's 2022 Proxy Statement filed with the SEC during the Relevant Period.

209.   By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

210.   Plaintiff on behalf of Stanley has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

211.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212. The Individual Defendants, by virtue of their positions with Stanley and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Stanley and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Stanley to engage in the illegal conduct and practices complained of herein.

213. Plaintiff on behalf of Stanley has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

214. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

215. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Stanley's business and affairs.

216. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

217. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Stanley.

218. In breach of their fiduciary duties owed to Stanley, Individual Defendant willfully or recklessly and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) present economic conditions, including increasing interest rates, inflations, and consumers returning to work in the office was rapidly degrading the heightened demand Stanley had experienced in 2021 for their tools and

outdoor products; (2) demand was quickly returning to 2019 pre-pandemic levels; (3) operations results were showing that the Company's heightened demand was slowing; (4) Stanley's reorganization efforts, share repurchasing, and increased dividends resulted in Stanley lacking the necessary cash to react to changes in demand; (5) Stanley's failure to react to falling demand severely and negatively impacted the Company's financial results which resulted in lost shareholder value; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

219.   The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

220.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

221.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

222.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was

committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Stanley's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

223.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

224.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stanley has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

225.    Plaintiff on behalf of Stanley has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

226.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

227.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Stanley.

228.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Stanley that was tied to the performance or artificially inflated valuation of Stanley, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

229.    Plaintiff, as a shareholder and a representative of Stanley, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

230.    Plaintiff on behalf of Stanley has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

231.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

232.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Stanley, for which they are legally responsible.

233.    As a direct and proximate result of the Individual Defendants' abuse of control, Stanley has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Stanley has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234.    Plaintiff on behalf of Stanley has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Stanley in a manner consistent with the operations of a publicly-held corporation.

237.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Stanley has sustained and will continue to sustain significant damages.

238.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

239.     Plaintiff on behalf of Stanley has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

240.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

241.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

242.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Stanley to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

243.     In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

244.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

245.     Plaintiff on behalf of Stanley has no adequate remedy at law.

## NINTH CLAIM

**Against Defendants Allan, Loree, and McChesney for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

246.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

247.    Stanley, Defendant Allan, Defendant Loree, and Defendant McChesney are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Allan's, Loree's, and McChesney's willful and/or reckless violations of their obligations as officers and/or directors of Stanley.

248.    Defendants Allan, Loree, and McChesney, because of their positions of control and authority as officers and/or directors of Stanley, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Stanley, including the wrongful acts complained of herein and in the Securities Class Action.

249.    Accordingly, Defendants Allan, Loree, and McChesney are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

250.    As such, Stanley is entitled to receive all appropriate contribution or indemnification from Defendants Allan, Loree, and McChesney.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Stanley, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Stanley;

(c)     Determining and awarding to Stanley the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Stanley and the Individual Defendants to take all necessary actions to reform and improve Stanley's corporate governance and internal procedures to comply with applicable laws and to protect Stanley and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Stanley's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Stanley to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Stanley restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)   Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 2, 2023                    Respectfully Submitted,


**FAXON LAW GROUP, LLC**

  **//s// Eric P. Smith (ct16141)**
Joel T. Faxon (ct 16255)
Eric P. Smith (ct 16141)
59 Elm Street
New Haven, CT 06510
Telephone: (203) 624-9500
Facsimile: (203) 624-9100
Email: jfaxon@faxonlawgroup.com
            esmith@faxonlawgroup.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**Bronstein, Gewirtz & Grossman, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
            eitank@bgandg.com

## <u>VERIFICATION</u>

I, Dylan Callahan, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 29 day of July, 2023.

DocuSigned by:

*Dylon Callahan*

3CD3EAD305B9442...

Dylan Callahan